UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22CR80081

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ANA BEATRIZ HERNANDEZ

    Defendant.

_____/

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

COMES NOW, the Defendant, Ana Beatriz Hernandez ("Ms. Hernandez"), by and through undersigned counsel, and respectfully submits this Memorandum in Aid of Sentencing for the Court's consideration, and in support thereof, states as follows:

As more fully detailed below, and in accordance with her Plea Agreement with the Government (D.E. 12), Ms. Hernandez respectfully requests a sentence in accordance with the terms of her plea agreement at the low end of the Guideline range(6 months), substituting home confinement for incarceration. Ms. Hernandez respectfully avers that such sentence is also appropriate pursuant to 18 U.S.C. § 3553 based on her:

1. Cooperation with the instant investigation into her own conduct and that of her husband and companies;
2. extraordinary family circumstances;
3. history of ongoing depression and anxiety;
4. extraordinary history of good works within the community; and
5. lack of criminal history.

    **I.**    **PROCEDURAL BACKGROUND**

On June 22, 2022, Ms. Hernandez pled guilty to a one-count Information which charged her with possession of a false identification document, in violation of 18 U.S.C. § 1028(a)(4)(b)(6).

This plea was entered pursuant to a negotiated agreement with the government. (DE 12). Ms. Hernandez's sentencing hearing is presently scheduled on September 9, 2022.

The Government and Ms. Hernandez agree that her total adjusted offense level is 10, with a criminal history category of Level I. This would place her guideline sentencing range at 6-12 months' imprisonment, which is in Zone B of the Sentencing Table. Pursuant to the Plea Agreement herein, the parties jointly recommend that the Court impose a low-end guidelines sentence that substitutes home confinement for imprisonment at the low-end of the guideline imprisonment range, which in this case would be six (6) months. (DE 12 at ¶ 15(b).)

## II.     PERTINENT HISTORY AND BACKGROUND

### A. Background

Ms. Hernandez is a Venezuelan-American immigrant who came to the United States in search of an education and better life. Growing up in Venezuela with her two siblings, Ms. Hernandez had a good childhood with two involved, loving parents. She earned a B.S. in electrical engineering while at college in Venezuela, and then moved to Delaware to study English, with the hopes of securing better employment in her field of study. While in Delaware, Ms. Hernandez met her current husband, Juan Gonzalez, who is a defendant in Case No. 22-CR-60101, also before your honor, who was also a student and an aspiring scientist when they met. They have one daughter together, Lia.

*1. Family Struggles with Emotional Illnesses*

As described in the PSR, and documented by the letter from treating physician, Dr. Raquel Herrero, attached hereto as **Exhibit "A"**, Ms. Hernandez suffers from severe and debilitating Anxiety Disorder, Panic Disorder, Adjustment Disorder with Depressed Mood, and ADHD. *Id.*

Dr. Herrero writes:

> Mrs. Hernandez has been under my care since April 8, 2019. She is being treated for Generalized Anxiety Disorder, (F41.1), Panic Disorder, (F40.1), Adjustment

2

> Disorder, with depressed mood (F43.21) and Attention Deficit-Hyperactivity Disorder, inattentive type (F90.0), diagnoses recognized by the DMS-V. She is currently on:
>
> • Lexapro 20 mg take by mouth once daily
> • Adderall 15 mg take by mouth daily at 3 pm
> • Xanax 0.5 mg by mouth once daily as needed for anxiety
>
> Presently, Mrs. Hernandez persists with marked anxiety symptoms, concentration problems, and, more recently, associated depressive symptoms. She continues to report problematic and recurrent periods of anxiousness, excessive worry, inability to maintain emotional composure, distractibility, difficulty in staying on task and organized, procrastination, limited decision-making and problem-solving skills, recurrent panic attacks, sleep changes, depressed mood, irritability, anergia, anhedonia, excessive worry, isolation, ruminations, and worthlessness. In addition, her symptoms are exacerbated by several psychosocial stressors, including ongoing legal problems, current financial situation, family conflicts, daughter's current mental health issues, among other psychosocial stressors. Reportedly, her symptoms affect her overall functioning across all settings. For such reason, Mrs. Hernandez requires psychiatric treatment follow-ups and Individual Psychotherapy (unable to do at the time due to financial constraints).

*Id.*

Ms. Hernandez's husband also suffers from debilitating mental illness, which, upon information and belief, will be detailed in his Sentencing submission. As would be expected, Mr. Gonzalez's mental health issues have further stressed Ms. Hernandez and exacerbated her own anxiety and vice versa. This has been a difficult issue for the family.

Complicating the situation even further, the couple's only child, Lia, inherited severe and crippling emotional difficulties, which were exacerbated when the family came under investigation four years ago. Lia's anxiety has become so severe, that she has not been able to advance her High School studies for the last two years. While her friends and previous classmates are now all High-School Seniors sharing the dream of applying to universities, today Lia remains a Sophomore. During the beginning of the COVID pandemic, Lia switched from being one of the top students at her school, to failing all of her classes, and ultimately quitting school altogether.

Dr. Herrero, who also treats Lia, writes:

> I am writing as the treating psychiatrist for Ms. Lia Gonzalez. Ms. Gonzalez has been under my care since May 5, 2019. She is being treated for Generalized anxiety Disorder (F41.1), Panic-Disorder (F40.1), and Attention Deficit-Hyperactivity Disorder, inattentive type (F90.0), diagnoses recognized by the DMS-V.
>
> She is currently on:
>
> - Fluvoxamine 100 mg po twice daily.
> - Concerta 54 mg taken by mouth daily in the mornings.
> - Vistaril 25 mg taken by mouth once or twice daily as needed for anxiety.
>
> Presently, Ms. Gonzalez continues reporting marked anxiety symptoms and concentration problems. She persists with recurrent and problematic excessive anxiety, recurrent panic attacks, constant worry and fear, difficulty in controlling worry, apprehensive expectations, overthinking plans and solutions to all possible worst-case outcomes, difficulty handling uncertainty, indecisiveness, inability to relax, restlessness, fatigue at times, muscle tension, nervousness, unexplained physical symptoms, inability to maintain emotional composure, distractibility, difficulty to stay on task and organized, procrastination, sleep disturbances, ruminations, marked emotional dysregulation and worthlessness, low frustration tolerance, limited decision making, and problem-solving skills. Her symptoms have minimally improved despite multiple pharmacological and psychosocial interventions. These continue to affect her overall functioning across all settings.
>
> As reported, Ms. Gonzalez's symptoms are precipitated by several psychosocial stressors, including family conflicts and academic problems, and affect her family dynamics. Throughout this time, she has not been able to return to school after several attempts, was unable to maintain a job, and has limited socialization with selected friends. Presently, she partially responds to current pharmacological interventions and requires weekly psychotherapy.

Please refer to **Exhibit "B"**, annexed hereto. *See also* ¶ 41 of the PSR[1]

Each member of the Gonzalez-Hernandez family has sought help for their individual emotional and psychological problems. Of course, Lia's mental health issues are of paramount concern for the family. As described by Ms. Hernandez's close friend, Jorge Quintero:

> I admire Ana. As any other mother and wife, she takes care of her kid and her husband, but not without challenges that are above and beyond what a normal person goes through. She suffers from depression and anxiety, and she needs to battle with that every day. In addition,

---

[1] "Lia suffers from severe depression and crippling anxiety. She is under the care of a psychiatrist and taking medication; however, the medication is still being adjusted and has not provided significant improvement to her conditions. She has previously been hospitalized for several weeks for these conditions." *Id.*

her daughter and husband also suffer the from the same conditions. Lia, her daughter, has such a big anxiety problem, she can't go to school, and it is very difficult for her to socialize. Imagine you seeing your kid suffering from that, it is heart breaking. Ana's husband, Juan, who is a brilliant scientist, also suffers from depression to the point that some days he cannot get out of bed. What is extraordinary about Ana, is that she is the support of the family, she takes care of her daughter, dealing with psychologist and other specialist, dealing with not going to school and not socializing, then dealing with her husband and trying to accommodate her life to help him as much as possible and at the same time, dealing with herself and her issues, and on top of that being the best friend anybody can be. I don't know how she does it, it is unreal.

Please refer to **Exhibit "C"**, annexed hereto and incorporated by reference.

Lia's emotional difficulties have necessitated an interruption of her education and the pandemic also interrupted her in-person psychiatric counseling. However, as documented in the PSR and Dr. Herrero's letter, the Gonzalez's have remained vigilant regarding Lia's care, scheduling online therapy twice per week. *See* **Exhibit "B"**. Ms. Hernandez has explained to probation that after this case is resolved her time will be dedicated to helping Lia complete online schooling, and "to provide comfort and support for the duration of her coursework". *See* PSR ¶ 41. Ms. Hernandez also hopes to participate full time in her daughter's therapy "to allow her to reach a much better state of mental health." *Id.* Ms. Hernandez accordingly urges the Court to impose home confinement so that she can continue to care for her daughter.

***Comparable Cases***

Although the instant sentencing request is within the suggested Guideline range, the below list of cases, in which parental responsibilities played a significant sentencing factor, are respectfully submitted to illustrate that parental responsibilities are an appropriate consideration for the Court in permitting home-confinement to substitute incarceration, as proposed herein. In this regard the defendant respectfully cites to the following cases:

> *United States v, Leah Solomon*, 2022 WL 593842 (S.D. Fla.) Case No. 19-CR-20674-DPG. Downward variance granted by Judge Gayles in a fraud case from the guideline range of 78-97 months to 30 months because the defendant is the sole supporter of her four children, two of whom suffer from Autism Spectrum Disorder.

*United States v. Jean Adames*, (S.D. Fla.) Case No. 21-CR-60065-WPD. Downward variance granted in a drug case by Judge Dimitroleaus from the guideline range of 37-46 months to 18 months because of the defendant's parental responsibilities for his thirteen-year-old daughter for whom he had shared custody.

*United States v. Michael Renda*, 2012 WL 8262250 (S.D. Fla.) Case No. 10-CR-80149-KAM. Downward variance granted by Judge Marra in a fraud case from the guideline range of 27-33 months to 9 months, plus supervised release because the defendant's wife had to travel out of state three times per month for work, which would have left non one to care for their young son.

*United States v. Nadine Barnes*, 2012 WL 9510712 (N.D. Fla.) Case No. 12-CR-00045-RH-CAS. Downward variance granted in a fraud case to probation and community confinement because the defendant was the sole supporter of her disabled husband.

*United States v. Rosa Clavell*, 2016 WL 11686628 (S.D. Fla.). Case No. 15-CR-20773-KMW. Downward variance granted by Judge Williams in a fraud case to a probationary sentence because of the defendant's role as a caretaker for her husband who suffered from a brain injury and resulting cognitive deficits.

2. **Ana Hernandez is a good person who made a mistake**

    a. **Ms. Hernandez goes out of her way to help people**

**"Ana is one of those individuals very hard to find. She is the definition of a real, truly good friend who deeply cares."**

Jorge Quintero, **Exhibit "C"** *infra*

As demonstrated by the character letters attached hereto, Ms. Hernandez has deeply impacted the people in her life. As detailed by Mr. Quintero:

> I have many examples showing this, but I want to mention the one that really impacted my life and is the reason my family is still together.
>
> About 4 years ago, we had a situation that really shook my family, and my marriage was in jeopardy. It is the only time during my 20-year marriage I thought that was it. My wife and I had opposite opinion on how to confront a specific complicated situation our son was going through, and we reached a point where there was no common ground. It was very complicated and as I mentioned it almost caused a divorce. Ana found out what was going on and instead of taking sides she approached the situation in a very smart way. She started talking to me, asking me many questions, asking me to look on different perspectives and to try to see things from a different point of view. Ana did the exact same thing with my wife. It was not easy, it was many conversations, many arguments, many discussions but Ana never gave up. She never said you are wrong, or she is wrong, she was just there to listen. To this day me and my wife know Ana save our marriage and our family. Today we live happily together with our 2 kids and for the most part thanks to Ana. I will never forget this, and I will always be thankful for what she did.

6

> Ana has something not too many people have, and it is she really knows how to listen. She pays attention to you with the intensity that makes you believe you are the only person in the world; and not only that, but she does it also with the same intensity and focus whether she is talking to a 10-year-old, a teenager or an 80-year-old person. My kids love her, but you must see how Ana ask them questions about their lives and their friends and school and everything else, like she really, genuinely cares.
>
> The same way Ana asks many questions when helping her friends, she does the same when it comes to social issues and public elections. She cares about many social issues in a way not everybody does. When it comes to election time, at any level, from local city elections to presidential elections, she makes sure she is very well informed and that her circle of friends has access to the same information. She doesn't push for one candidate specifically, but she makes sure people make informed decisions. She sends you information about the main issues being at play and what each candidate things(sic) about and the impact they can make.

See Letter of Jorge Quintero, *Id.*

Ms. Hernandez's generosity and kindness solidified her friendship with Vicky Laurens, who recounts:

> Ana and I met during our first year of University for our B.S degree in engineering and became friends for life. We were teammates on several occasions through our studies and I could always rely on her delivering what she committed to do. Her generosity and integrity were best exemplified when she found out her application to be transferred to the school of electronics engineering was accepted and my application was denied. Ana believed I deserved to be admitted into the program more than she did and was willing to go to the Dean's office to give away her spot for me to take it. We both agreed that based on the requirements, I was better qualified to be accepted into the program. Although I was impressed and touched by her generosity, I had to work hard to convince her not to give away her spot in the program. I ended up being accepted into the program after I requested my application to be reviewed, but that moment solidified our friendship. Her offer was an example of her selfless character of helping others and doing what is right. Additionally, Ana was a role model to many of her classmates, she was awarded the Best Athlete of the first Intramural Games at our University for her accomplishments on the games. She was humble and did not change her attitude at all.

See **Exhibit "D"**, annexed hereto and incorporated by reference.

Monica Carrasco, a close friend, details how Ana was willing to share her own experiences to assist Ms. Carrasco and others deal with her son's mental health problems, writing:

> We talked long hours about our kids' special needs such as Lia's anxiety and the effect in her academic performance and social skills, and my son's needs as having deficit attention and similar social difficulties. She helped me with a contact for psychological help for my son, also with reading material and tips like meditation and other activities. Her own

> limitations suffering ADHD and depression help Ana to understand her own daughter and husband's difficulties and make her passionate to help other understand mental disease. She helped me understand how to handle critical situation (with a friend) and be alert to possible depression events that can happen within my own family and friends.

See **Exhibit "E"** annexed hereto and incorporated by reference.

Another dear friend, Patricia Sarmiento similarly recalls Ana's generosity and kindness, detailing:

> We became very good friends and I found out about her ADHD situation. She suffers with that anxiety, and she is in a constant battle to make sure she can take care of her family. But not only her family, she cares about people around her; Ana had a lady who helped her with her house, cleaning and many other chores; her name was Olguita and she was a humble nice person. Olguita's son got seriously sick, and she couldn't afford what was needed. Ana went out of her way to gather her community get them to help and make sure Olguita's son was getting the right treatment. She even took care of Olguita herself while she was not able to work. She treated her as family as if she was her own mother. It was a big display of humanity and an example of the type of person Ana is and the type of people this planet needs.

See **Exhibit "F"**, annexed hereto and incorporated by reference.

### b. *Ana Hernandez has shown herself to be a Valuable Member of the Broader Community*

As demonstrated in the character letters submitted herewith, Ms. Hernandez also cares deeply about her community and the world, and works to contribute meaningfully to both. Monica Carrasco writes:

> As part of her personality always looking after her people, Ana is very concern about the situation in Venezuela and has a great heart for helping people. She asked me to participate in several events that collects donations like food and essential items, also she is constantly gathering donations herself to send to friends and family leaving(sic) in Venezuela. She is very active in recovering democracy in Venezuela, always watchful of sending me information about events that help the freedom cause such as fundraising concert, protests gathering, signature collection to take our voices to US government agencies that can help our people. In addition to her own country, Ana is always watching to help anyone in need, even one time she sent me information to help protect the freedom and safety of Afghan women and girls.

See **Exhibit "E",** annexed hereto and incorporated by reference.

Raul Arriaga shares his gratitude for Ms. Hernandez's courage when she stood up for a journalist in Venezuela who was targeted for political persecution and states:

> "… when one of my sisters became a target of political persecution in Venezuela due to her job as a journalist, Ana Beatriz helped me by spreading the word and contacting as many people as possible via social media to create awareness about the unfair situation. She contributed to creating enough critical mass and my sisters' case was finally resolved. will always be grateful for Ana's help in this matter.

See **Exhibit "G",** annexed hereto and incorporated by reference.

This community involvement benefits Ms. Hernandez's local community as well. Ms. Carrasco further details:

> Ana also volunteers in her daughter's school, cheering for her theater/acting activities, asking her friends to participate in fundraisers to help the school. Ana is also very concern about her friends, family and community wellbeing and health. Year after year on her wedding anniversary Ana and Juangui invite all their friends and family to participate in a 5K run, offering prizes, food, drinks, games, and music, making this run an event awaited by all. My family participated in 3 runs and they were memorable experiences, especially for my boys at their early age, Ana gives them their first trophy. I believe that was an inspiration for my youngest son as he is today part of the school running team and he keeps the jersey of his first Ana's run in 2009.

*Ibid.*

Patricia Sarmiento writes that Ms. Hernandez's involvement in the community has been inspirational and contagious, stating:

> I have always been inspired by the way Ana treats people, from my kids, who love her, to people in the school. Ana always helped as volunteer in the school organizing events and assisting teachers with everyday needs. That made me understand the importance of being involved with your community and how the way you interact with people makes a huge difference.

See **Exhibit "F".**

Several more of Ms. Hernandez's friends have submitted letters to the Court on her behalf. Each letter offers a unique perspective of her innately generous and charitable nature and otherwise good reputation in the community. Please see **Composite Exhibit H** attached.

## **MEMORANDUM OF LAW**

**I.   Propriety of within-Guidelines Sentence of Probation substituting Period of Incarceration with Home Confinement Pursuant to Title 18 U.S.C. § 3553(a)(2)**

**A.  *Booker* and its Progeny**

Pursuant to *United States v. Booker,* 543 U.S. 220, 245-67 (2005)[2], sentencing courts are now unencumbered in their ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue". *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)). To guide a court's discretion, Title 18 U.S.C. § 3553(a)(2), requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established;
> (5) any pertinent [Sentencing Commission] policy statement;
> (6) the need to avoid unwarranted sentence disparities among defendants; and
> (7) the need to provide restitution to any victims of the offense.

18  U.S.C. § 3553(a)(1)-(7)

---

[2]  The decision of the United States Supreme Court in *Booker* has rendered the United States Sentencing Guidelines "effectively advisory".  Although sentencing courts are required to consider a Defendant's guideline range, they may "tailor the sentence in light of other statutory concerns as well." *Id*. at 220, 222.

10

Moreover, § 3553(a) and the 'parsimony provision' mandate that the District Court "impose a sentence sufficient but not greater than necessary" to comply with the purposes of sentencing set forth in § 3553(a)(2). Sufficiency of a sentence rather than excessiveness is echoed in 18 U.S.C. § 3582, which recognizes that "imprisonment is not an appropriate means of promoting correction and rehabilitation."

### Pertinent factors pursuant to Title 18 U.S.C. § 3553(a)(2)

*The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

The significance of this first § 3553 factor is found in its comprehension that a defendant's criminal conduct must be considered in the context of her entire life. As Judge Rakoff noted in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), the importance of considering a defendant's history reaches its zenith at the moment the court determines the sentence to be imposed:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics' of the defendant.

*Id.* At 513–14.

The tenet in *Adelson* that a defendant's criminal conduct must be measured against his(her) overall life has particular resonance in the instant case. Ms. Hernandez most certainly made a mistake for which she has been paying dearly. Yet, even through her tremendous emotional and personal struggles she has managed to continue to contribute invaluable love and support to her family, her friends, and her community. She also did the right thing in this matter by assisting the Government with its investigation. It is respectfully urged that neither the Guidelines in this case,

nor Ms. Hernandez's history, suggest that a period of incarceration is warranted to achieve any recognized goal of sentencing. The difficult personal circumstances present here do mitigate in favor of a sentence that permits Ms. Hernandez to stay home and care for her daughter.

### *The Nature and Circumstances of the Offense*

Ms. Hernandez absolutely takes responsibility for her conduct, which she fully acknowledges. As further detailed herein, she has cooperated with the Government's investigation in both the instant case and the investigation of her husband and their companies. She has met with the Government and honestly disclosed all information known to her, and she continues to be available for continued cooperation as needed.

### *Acceptance of Responsibility*

Under U.S.S.G. § 3E1.1, Ms. Hernandez also demonstrated acceptance of responsibility for the offense by timely notifying authorities of her intention to plead guilty. She stands before the Court acknowledging her conduct in the instant case and has demonstrated, through her cooperation and continuing assistance with the government, her full acceptance of responsibility.

### *The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

There is no question that punishment is an important component of sentencing. However, in imposing "just punishment" for an offense, a sentencing court should not focus solely upon incarceration and disregard the additional penalties and hardships that accompany an investigation and conviction. For Ms. Hernandez and her daughter, who suffers from severe anxiety in the best of times, the fact of this investigation has been debilitating. The uncertainty that this case has created for the Hernandez family has impacted her daughter horribly. The anguish, fear, and guilt suffered by Ms. Hernandez, which of course includes the fear of how the family can survive economically and emotionally, has already been a significant punishment. Ms. Hernandez's life has been shattered by this case. She has paid already severe consequences in terms of mental health

during the four years that the investigation hit her and her family. And she will continue to pay consequences in the future: she now bears the label of a convicted criminal with a criminal history, which will stay with her for the rest of her life. There is no doubt that such a record will be a barrier to future aspects of her life, and will make things that were simpler in her past life (such as finding employment, obtaining professional licenses, being given positions of trust, starting a business, etc.) substantially harder. This is a tangible price that she is already paying now, and given the fact that Federal crimes are not expungable, she will continue to pay this high price for the rest of her life.

In a recent opinion, Judge Fredrick Block concluded that "sufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016)(varying downward from guideline range of 33 to 44 months' imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon); *see also* Jeremy Travis, *Invisible Punishment: An Instrument of Social Exclusion, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment* (Marc Mauer & Meda Chesney-Lind eds., 2002).

A guideline sentence at the low end of the guidelines, that is, home confinement for six (6) months to replace a period of incarceration, will not only satisfy the statutory goals of sentencing, but will constitute a sentence that reasonably provides just punishment and promotes respect for the law, and will afford adequate deterrence as required by § 3553. It will also help to ensure that Ms. Hernandez's daughter Lia gets the care she needs.

### *General Deterrence to criminal conduct*

The principle of general deterrence is based on the unsupported premise that prison

sentences deter crime. This faulty conception has resulted in mass incarceration in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www.brennancenter.org/publication/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom?"*, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

(*Id*. at 1031).

The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter crime. (*See id*.); *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963)("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes"). Indeed, seemingly unnecessary and vindictive punishment can also serve to undermine respect for the law and promote derision for the criminal justice system, effectively undermining the enunciated goals of sentencing.

### *Specific Deterrence to Criminal Conduct*

Ms. Hernandez is remorseful and ashamed of her conduct. Even though this is a misdemeanor offense, for Ms. Hernandez, it is a blight to her good-standing in the community. Her reputation has been harmed, and she will forever bare the humiliation of her conviction. Her family, friends, and the community at large are all well aware of her present circumstance. Suffice to say, Ms. Hernandez will never again be called to appear before the Court as a criminal defendant.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Ms. Hernandez, it is respectfully submitted that this Court should consider the statistically low risk of recidivism presented by her. See *United States v. Urbina*, slip op., 2009 WL 565485, *2-3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties).

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). The 2016 study by the National Institute of Corrections establishes three critical tenets. First, incarceration has a negligible impact on crime prevention. Instead, a longer prison sentence may actually lead to a greater risk of recidivism. *See id*. There is, in fact, strong evidence that prison—by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders—leads to increased recidivism. *See The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007). Moreover, harsh penalties do not improve the long-term outcomes of the offender. Ex. 10 at 4. *See also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887). ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of

estrangement; it strengthens the power of resistance"). Finally, the study concludes that community correction programs are more effective in reducing recidivism. *Id.* Indeed, the Bureau of Prisons has shifted its focus to successful reentry.

### *Need to Protect the Public*

Ana Beatriz Hernandez is a fifty-year-old, married, first-time, non-violent offender, who cares for her teenage daughter. Incarceration is wholly unnecessary to protect the public from the threat of any further crimes. With respect to defendants like Ms. Hernandez who are educated, married, have been employed, and are in their 50s, the chance that she will recidivate is very low.

The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *See* First Offender at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); Measuring Recidivism at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power" of the guidelines "if incorporated into the criminal history computation"). The Commission has not implemented any such revisions to the criminal history guidelines, but has recently stated that age "may be relevant" in granting a departure. *See* USSG § 5H1.1.

### *The Kinds of Sentences Available. The sentencing range established, and pertinent policy statements*

The adjusted offense level in this misdemeanor case is a 10, placing Ms. Hernandez's guideline in Zone B of the sentencing Table. Indeed, the parties both agree that a sentence at the low end of the Guideline range (6 months), which replaces incarceration with home confinement is appropriate in this case. The interests of society are best served by a sentence that permits Lia, Ms. Hernandez's daughter, to continue to receive care from her mother. Such a sentence is all that is necessary to satisfy the enunciated goals of sentencing.

Further, given the low risk that Ms. Hernandez poses of re-offending, and the need for her to focus on her daughter's well-being and work, it is respectfully submitted that additional

Probation or Supervised Release is unnecessary, would be costly, and would merely serve to interfere with Ms. Hernandez's substantial responsibilities to her family.

## CONCLUSION

As the foregoing establishes, the circumstances presented in Ms. Hernandez's case, including: her family circumstances, her otherwise good character, and her cooperation with the government, mitigate heavily in favor of a sentence at the low end of Guideline range, substituting incarceration with home confinement, and that such a sentence is supported by the considerations contained in 18 U.S.C. § 3553(a).

Dated: September 1, 2022              Respectfully submitted,

**PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP**
Tama Beth Kudman, Esq.
7108 Fairway Drive, Suite 130
Palm Beach Gardens, Florida 33418
Tel: (561) 472-0811; Facsimile: (561) 828-0210

By: /s/ Tama Kudman
   Florida Bar No. 637432
   tbk@pietragallo.com

*Attorneys for Defendant Ana Beatriz Hernandez*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed electronically via CM/ECF, and furnished electronically to all counsel of record on September 1, 2022.

By: /s/ Tama Kudman